# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 10, 2015

Lyle W. Cayce
Clerk

No. 14-30021

BRENDA MASON, Individually and on behalf of Quamaine Dwayne Mason;
BILLY C. MASON, Individually and on behalf of Quamaine Dwayne Mason,

   Plaintiffs–Appellants,

v.

LAFAYETTE CITY-PARISH CONSOLIDATED GOVERNMENT; JAMES P.
CRAFT, In His Official Capacity as Chief of Police; MARTIN FAUL,
Individually and in His Official Capacity,

   Defendants–Appellees.

---

Appeal from the United States District Court
for the Western District of Louisiana

---

Before JOLLY, HIGGINBOTHAM, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

  Officer Martin Faul fatally shot Quamaine Mason while responding to a reported armed robbery. Mr. Mason's parents, Brenda and Billy Mason (together, the Masons), sued Faul asserting Fourth, Fifth, Eighth, and Fourteenth Amendment violations. The Masons also brought *Monell*[1] claims against Faul's employer, Lafayette City–Parish Consolidated Government (Lafayette), and James Craft, Lafayette's Chief of Police. The complaint also

---

[1] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

No. 14-30021

included claims against all three defendants under Louisiana state law.  Faul raised the defense of qualified immunity.  The district court granted the defendants' motion for summary judgment and dismissed all of the Masons' claims.  Because there are material fact issues that preclude summary judgment in favor of Faul on the basis of qualified immunity, we reverse the summary judgment as to Faul on the Masons' Fourth Amendment and state law claims and remand them to the district court. We otherwise affirm the district court's judgment.

# I

Because the district court disposed of the case on summary judgment, we state the facts of the case in the light most favorable to the Masons, the nonmovants below.[2]  At the time of his death, Mr. Mason was dating Racquel Babino.  Mr. Mason knew that Paul Pitkins, the father of Babino's child, was coming to her apartment one evening regarding a phone bill.  Mr. Mason did not know that Babino planned to prepare dinner for Pitkins and his cousin, Jeremy Richardson, to celebrate Pitkins's recent college graduation.

Mr. Mason came to Babino's apartment that evening to pick up his dog. He saw Babino through the apartment window and became upset, banging on the door and yelling.  Babino asked her roommate to answer the door, and Babino locked herself in her bedroom with Pitkins and Richardson.  Mr. Mason entered the apartment and attempted to pry open the bedroom door with a spoon.

Babino eventually opened the bedroom door.  Mr. Mason entered the bedroom carrying a gun and ordered Pitkins and Richardson to leave.  Mason threatened to "pistol whip" someone, but Babino states that the gun remained pointed at the ground at all times.  Babino and Mr. Mason later exited the

---

[2] *See Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012).

No. 14-30021

bedroom, and Mr. Mason eventually "got calm." They discovered that Mr. Mason's dog was missing and intended to leave the apartment to search for the dog.

In the meantime, Richardson had called 911. He told the operator that an armed individual had "broken into" Babino's apartment to get a dog. He stated that he did not know the individual but that Babino and Pitkins knew him. Richardson described the suspect to the operator as a black male, approximately six feet tall and weighing 200 pounds, wearing black jeans and a black shirt.

Officer Martin Faul volunteered to respond to an incident described as an armed robbery that had been reported at Babino's apartment. The Masons contend we must conclude that Faul approached the incident with no additional information because of his statements during his post-incident interview with the Louisiana State Police. The following exchange occurred between Faul and Frank Garcia, the State Police investigator:

> [GARCIA]: You volunteered for the call, okay. Where were you when y'all got dispatched out there?
>
> [FAUL]: I was en route to another armed robbery call around approximately Saint Christopher and Johnston.
>
> . . .
>
> [FAUL]: Yeah, I was going to Marshall's Department Store.
>
> . . .
>
> [GARCIA]: When the call came over, when dispatch put the call out, were there any particulars, any notes or comments in the comment section on the call?
>
> [FAUL]: Yes, I didn't read them, but she verbally dispatched them.
>
> [GARCIA]: Okay. What were the comments?
>
> [FAUL]: Armed robbery, 200 Theater, Campus Crossing Apartments, Black male, black pants, black shirt with a gun still in the apartment, apartment 712.

3

No. 14-30021

[GARCIA]: Okay, alright. And is there any particular reason why you decided to go out here instead of going to Marshall's?

[FAUL]: Yes, they had a canine handler already there. . . . I was going to keep rolling in case they you know they needed me. And then like I said when I got around Saint Christopher, the original, the first 64 [armed robbery] went to Charlie, so I put my base radio on Charlie and stopped it from scanning. And then I still had one on me on Alpha. So, I was still listening to Alpha. And when I heard that call come in on Alpha, I was so close. On Alpha, I said, "Headquarters distract from that first 64, show me en route to that one." You know, I don't know if I said I was closer or whatever, but they said, "10-4." And then . . . the computer and [sic] did all this stuff, but I never paid no attention to the computer.

The Masons argue that the "never paid no attention to the computer" statement shows that Faul had no information about the situation he approached.

 Faul arrived at the apartment complex and saw that Officers Brittney Dugas and Jace Galland were there. Faul removed his police canine from his car. The three officers encountered Richardson and Pitkins, who directed them toward Babino's apartment.

Mr. Mason and Babino opened the apartment door to find the officers with their guns drawn. Mr. Mason matched the description Faul alleges he received from dispatch. Babino moved in front of Mr. Mason. She positioned herself so that she shielded Mr. Mason from Officers Dugas and Galland. She screamed to the officers, "What are you doing? He's not doing nothing. What's wrong?"

The officers then issued commands to Mr. Mason and Babino, but the witnesses differ as to what commands were issued. According to Babino, the officers only ordered them to put their hands up. Faul asserts that Galland was the only officer to issue commands and that Galland told Mr. Mason and Babino to get on the ground. Dugas and Galland state that the officers issued

4

No. 14-30021

conflicting orders for Mr. Mason and Babino to keep their hands up and get on the ground.

Although the officers contend that Mr. Mason reacted to the commands by squaring up with Faul and tucking his chin as if he were preparing to fight, Babino claims that Mr. Mason had his hands up and was not moving. Faul saw a gun in Mr. Mason's waistband. Faul yelled "Gun!" and sent his dog towards Mr. Mason. Babino asserts that Mr. Mason only dropped his hands to his crotch after the dog had attacked him, in contrast to Faul, who claims that Mr. Mason's right hand went to his side before he released the dog.

Faul asserts that once the dog had attacked Mr. Mason, Mr. Mason's hand came in contact with his gun, so Faul began shooting. Babino asserts that Mr. Mason never did anything to require the officer to release the dog for an attack, that Mr. Mason never touched the gun, and that Mr. Mason never attempted to resist, assault or fire upon the police.

Faul's initial shot struck Mr. Mason in the chin. The second shot struck Mr. Mason in the right shoulder, moving slightly from the back to the front. The third shot struck the upper back part of Mr. Mason's right arm, fracturing his humerus. Dr. James Traylor, a forensic pathologist for the defense, stated that while the fracture would have severely restricted the movement of Mr. Mason's right arm, he would have been able to flex some at the elbow, though not very effectively, but that moving his arm "would have been extremely painful." Additionally, Dr. Traylor testified that Mr. Mason could still have moved his shoulder but also not very well. The fourth shot struck Mr. Mason in his lateral right chest wall, fracturing a rib. The fifth shot struck Mr. Mason on the upper back portion of the left arm, fracturing the left humerus. Dr. Traylor testified that at the time the fifth shot was fired, Mr. Mason was in a prone position, face down. Faul then temporarily stopped firing.

No. 14-30021

Faul claims that Mr. Mason then moved his shoulder and elbow as if he were about to spin over, pull out the gun, and start shooting. Officer Dugas asserts that Mr. Mason was "still trying to reach for [the gun]" after the first five shots were fired. Babino, in contrast, states that once Mr. Mason was on the ground she only saw him "pick up his head and put it back down" and that she never saw Mr. Mason "move his body, the trunk of his body." Faul fired two shots into Mr. Mason's back, and Mr. Mason stopped moving. Babino states that after the shooting ended, Mr. Mason's arms were not above his head but at his side.

Faul radioed for an ambulance and put the dog into a police vehicle. When Faul returned, Mr. Mason had been moved to a nearby breezeway, and Faul saw other officers were administering first aid to Mr. Mason. A civilian combat medic also helped care for Mr. Mason, but he died at the scene.

The Masons allege several irregularities in Lafayette's investigation of the shooting. First, police later recovered an eighth bullet lodged in a wall that did not strike Mr. Mason. Murphy Riggs, a relative of Mr. Mason, testified that when he arrived at the scene, a bullet hole in a structure had been patched, and the area had been cleaned with bleach. Second, before Frank Garcia, the State Police investigator, arrived at the scene, Mr. Mason's gun had been moved, and the magazine had been removed. Finally, after Faul's interview with Garcia formally ended, the Masons allege that the video camera captured the following exchange:

> Faul: Where was the gun when it was all said and done and who took it out? And where was it at?
>
> Garcia: [Lafayette Police Officer] Bart [Ryder] took it.
>
> Faul: Was it in his hand?
>
> Garcia: Best as I can figure.

No. 14-30021

The Masons, individually and on behalf of their son, Mr. Mason, sued Faul, Chief Craft, and Lafayette. They brought claims under 42 U.S.C. § 1983 alleging Faul (1) used excessive force in violation of the Fourth and Fourteenth Amendments; (2) deprived Mr. Mason of substantive due process under the Fourteenth Amendment by engaging in actions that "shock the conscience;" (3) and violated Mr. Mason's Eighth Amendment and due process rights by acting with deliberate indifference to his medical needs after the shooting. The Masons brought *Monell*[3] claims against Lafayette and Craft. The complaint also included state law claims against the three defendants. Faul pled qualified immunity. The district court granted the defendants' motion for summary judgment and dismissed all claims. The Masons appeal.

## II

We review the district court's grant of summary judgment de novo, applying the same standards as the district court.[4] Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5]

When reviewing a motion for summary judgment, we must "must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."[6] No genuine issue of disputed fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[7]

---

[3] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

[4] *Newman*, 703 F.3d at 761.

[5] FED. R. CIV. P. 56(a).

[6] *Newman*, 703 F.3d at 761 (quoting *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (per curiam)).

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

No. 14-30021

## III

A plaintiff suing under § 1983 must "(1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law."[8]   A § 1983 suit may be brought against a person in his or her individual or official capacity as well as against governmental entities.[9]

In an individual-capacity suit, a defendant may raise the defense of qualified immunity.[10]   "[Q]ualified immunity shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known."[11]   We analyze a defendant's assertion of qualified immunity under a two-prong test.[12]   The first asks whether the plaintiff has shown sufficient facts to "make out a violation of a constitutional right."[13]   The second prong requires the court to determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."[14]

## IV

We begin with the Masons' Fourth Amendment claim against Officer Faul.  When a police officer uses force to make a "seizure," we analyze a claim against the officer under the Fourth Amendment for "objective

---

[8] *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) (citing *Leffall v. Dall. Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994)).

[9] *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009).

[10] *Id.*

[11] *Id.* (quoting *Wallace v. Cnty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005)).

[12] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[13] *Id.* at 232.

[14] *Id.*

No. 14-30021

reasonableness."[15]   To prevail on an excessive-force claim, a plaintiff must show "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable."[16]

In *Tennessee v. Garner*, the Supreme Court explained that to reasonably use *deadly* force, an officer must, at the very least, have "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."[17]   The officer's reasonableness in using force—deadly or non-deadly—is analyzed under an objective standard "in light of the facts and circumstances confronting [the officer], without regard to [his or her] underlying intent or motivation."[18]   In *Graham v. Connor*, the Supreme Court directed courts determining an officer's objective reasonableness to pay "careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."[19]   We consider reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[20]   Additionally, we must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

---

[15] *Graham v. Connor*, 490 U.S. 386, 388 (1989).

[16] *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011) (quoting *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009)).

[17] 471 U.S. 1, 11 (1985) (providing this standard when an officer faces a fleeing suspect); *see also Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (applying the same standard to a non-fleeing suspect).

[18] *Graham*, 490 U.S. at 397.

[19] *Id.* at 396.

[20] *Id.*

No. 14-30021

evolving—about the amount of force that is necessary in a particular situation."[21]  Our inquiry is limited to whether the officer "was in danger at the moment of the threat" that resulted in the use of force.[22]

The district court did not correctly analyze the summary judgment record.  The district court appears to have relied entirely on the officers' account of events.  For example, the district court accepts as "uncontroverted" Faul's position that Mr. Mason's hand went toward the gun in his waistband before Faul released the canine.  Babino's account of the shooting, which conflicts with the officers' accounts in several key respects, is absent from the district court's opinion despite having been discussed in the Masons' briefing.  Babino's deposition contains an account of the shooting, and the facts she related are material to the Fourth Amendment question.

When addressing excessive-force claims, courts have an obligation to "slosh our way through the factbound morass of 'reasonableness.'"[23]  Additionally, the Supreme Court has recently emphasized that in an excessive-force case on summary judgment, like any other case, a court must accept as true the evidence of the nonmoving party and draw all justifiable inferences in that party's favor.[24]  The district court failed to give credence to, or even make note of, Babino's conflicting account of the shooting, which perhaps constitutes

---

[21] *Id.* at 396-97.

[22] *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011) (quoting *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir. 2001)) (emphasis omitted).

[23] *Scott v. Harris*, 550 U.S. 372, 383 (2007).

[24] *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

No. 14-30021

the Masons' strongest evidence. We must give full credence to Babino's testimony.[25]

As an initial matter, the Masons do not argue that Faul's use of the canine, by itself, violated the Fourth Amendment. Rather, they argue that a Fourth Amendment violation arose through Faul's use of his firearm and assert that the use of the canine against Mr. Mason while the shots were being fired is relevant to the question of Faul's reasonableness. Accordingly, we do not address the constitutional standards for use of a police canine.

We have explained that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."[26] Although the record reflects that there was a break between the first five and last two shots that struck Mr. Mason, and that Mr. Mason lay on the ground when the final two shots were fired, the district court did not expressly address whether Faul's use of his firearm was justified throughout the encounter. We conclude that genuine issues of material fact arise regarding the final two shots that struck Mr. Mason, which requires reversal of the summary judgment in part, and we do not express an opinion as to whether Faul was entitled to qualified immunity for each of the first five shots.

A reasonable jury could conclude that a reasonable officer in Faul's position would not have "probable cause to believe that [Mr. Mason] pose[d] a threat of serious physical harm"[27] at the time the final two shots were fired.

---

[25] *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("[T]he court . . . may not make credibility determinations." (citing *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990))).

[26] *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009).

[27] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (providing this standard when an officer faces a fleeing suspect); *see also Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (applying the same standard to a non-fleeing suspect).

No. 14-30021

Although Faul and Galland indicated that Mr. Mason moved in a threatening manner after he was on the ground, Babino's testimony contradicts this portion of the officers' accounts. Babino indicated that she was able to see Faul fire all seven shots that struck Mr. Mason. She further explained that once Mr. Mason was on the ground, she saw "him pick up his head and put it back down" but did not see Mr. Mason "move his body, the trunk of his body."

Other evidence in the record, viewed in the light most favorable to the Masons, corroborates Babino's testimony. Although Dr. Traylor, the defense expert, indicated that Mr. Mason might be able to make a slight movement with his right elbow, he also explained that it "would have been extremely painful" for Mr. Mason to use his right arm. Although Dr. Traylor's testimony can support favorable inferences for both parties about whether Mr. Mason moved his arm, at the summary judgment stage, we must conclude that Mr. Mason's arm was immobile while he lay on the ground.

In light of Babino's and Dr. Traylor's testimony, a reasonable jury could conclude that Mr. Mason lay incapacitated on the ground and did not move in a threatening manner before Faul fired the final two shots.[28] Accordingly, a reasonable jury could conclude that Mr. Mason objectively posed no immediate threat, such that Faul violated the Fourth Amendment by firing the final two shots.

We therefore must determine whether Faul is entitled to qualified immunity on the grounds that he did not violate clearly established law. The law is clearly established if there is factually similar, controlling case law from

---

[28] *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014) (suggesting, in dicta, that a Fourth Amendment violation might occur if the defendant officers "had initiated a second round of shots after an initial round had clearly incapacitated" the decedent); *see also Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (holding that an officer cannot use further non-deadly force against a "restrained and subdued" suspect).

No. 14-30021

this court or the Supreme Court.[29]   The present case is an "obvious one where *Graham* and *Garner* alone offer a basis for decision."[30]   The constitutionality of the final two shots can be decided on the threshold issue—under *Garner*—of whether *deadly* force was permissible, i.e., whether Mr. Mason objectively posed an immediate threat.[31]   The second, more complex inquiry dictated by *Graham*—balancing the severity of the threat against other factors[32]—is not necessary here.   A reasonable jury could conclude that when Faul fired the final two shots, Mr. Mason would have appeared incapacitated to an objectively reasonable officer.   Shooting a clearly incapacitated suspect is inconsistent with *Garner*'s command that deadly force is unconstitutional when a "suspect poses no immediate threat to the officer and no threat to others."[33]   We therefore conclude that there are material fact questions as to whether Faul is entitled to qualified immunity for firing the final two shots. The district court erred in granting Faul's motion for summary judgment on the Fourth Amendment and state law claims.

---

[29] *See Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) (assuming *arguendo* that controlling circuit court precedent could "be a dispositive source of clearly established law in the circumstances of this case"); *cf. McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) (en banc) ("[I]n the absence of directly controlling authority, a consensus of cases of persuasive authority might, under some circumstances, be sufficient to compel the conclusion that no reasonable officer could have believed that his or her actions were lawful.").

[30] *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

[31] *See, e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

[32] *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008).

[33] 471 U.S. at 11.

No. 14-30021

## V

The Masons argue that Faul violated Mr. Mason's substantive due process rights under the Fourteenth Amendment because his actions "shocked the conscience."[34]  In *Graham*, the Supreme Court held:

> *[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.[35]

While substantive due process applies to some police conduct, the Supreme Court has refused to look beyond the Fourth Amendment when the police "seize" a suspect.[36]  A seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied.*"[37]

Faul "seized" Mr. Mason when he terminated Mr. Mason's freedom of movement using the canine and his gun.[38]  The Masons substantive due process claim fails as a matter of law.

## VI

The Masons argue that Faul violated the Eighth and Fourteenth Amendments by acting with deliberate indifference by failing to render aid to Mr. Mason after the shooting.  The Eighth Amendment does not apply in the present case because no adjudication of Mr. Mason's guilt occurred.[39]

---

[34] *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

[35] *Graham*, 490 U.S. at 395.

[36] *See Lewis*, 523 U.S. at 843-45.

[37] *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989).

[38] *See Petta v. Rivera*, 143 F.3d 895, 913-14 (5th Cir. 1998) (noting that the fact that the officer's bullet did not strike the plaintiff prevented the case from being a seizure case analyzed under the Fourth Amendment).

[39] *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

No. 14-30021

Therefore, we turn to the Masons' claim under the Fourteenth Amendment's Due Process Clause.

"The Due Process Clause . . . require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police."[40] "[T]he plaintiff must show that an officer acted with subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference."[41] Deliberate indifference is "an extremely high standard to meet."[42] A plaintiff "must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"[43]

The Masons' deliberate indifference argument is narrow. The Masons allege that Lafayette's police policy requires an officer to "immediately . . . determine the physical conditions of any injured person and render first aid." They note that after the shooting, Faul called an ambulance, left to put the dog into the police vehicle, and returned to render first aid but found others addressing Mr. Mason's wounds; they find fault with the fact that Faul did not *personally* participate in Mr. Mason's care. They also seek to hold Faul liable for the inadequate care by others because Mr. Mason was dragged by his legs from the scene of the shooting to a nearby breezeway.

Faul's conduct did not rise to the level of deliberate indifference. A failure to follow official policy, by itself shows, at most, negligence and cannot

---

[40] *Id.*

[41] *Hill v. Carroll Cnty.*, 587 F.3d 230, 238 (5th Cir. 2009).

[42] *United States v. Gonzales*, 436 F.3d 560, 574-75 (5th Cir. 2006) (citing *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001)).

[43] *Domino*, 239 F.3d at 756 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

No. 14-30021

support a finding of deliberate indifference.[44] Faul's decision to place the dog, which had been attacking Mr. Mason, in the police car, and to defer to other officers to attend to Mr. Mason, cannot fairly be described as showing "a wanton disregard for [Mr. Mason's] serious medical needs."[45] Additionally, when addressing deliberate indifference, we must evaluate an official's conduct individually rather than collectively so long as multiple officials are not acting in unison.[46] The other officers' decision to drag Mr. Mason, if deliberate indifference, cannot give rise to liability for Faul. Faul is entitled to judgment as a matter of law on the deliberate indifference claims.

## VII

The Masons also bring claims against Lafayette and Chief Craft, in his official capacity. Because Craft was sued in his official capacity, the claim against him is treated as a claim against Lafayette, a municipality.[47]

In *Monell v. Department of Social Services*,[48] the Supreme Court held that a municipality cannot be held liable under § 1983 solely because its employee committed a constitutional tort.[49] In other words, a plaintiff cannot prevail on a theory of *respondeat superior*.[50] Accordingly, to hold a municipality liable under § 1983, the plaintiff must prove three elements: (1)

---

[44] *See Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 398 (5th Cir. 2000).

[45] *Domino*, 239 F.3d at 756.

[46] *Jacobs*, 228 F.3d at 395.

[47] *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

[48] 436 U.S. 658 (1978).

[49] *Id.* at 691.

[50] *Id.*

No. 14-30021

a policymaker; (2) an official policy; and (3) a "violation of constitutional rights whose 'moving force' is the policy or custom."[51]

We have defined "official policy" to mean:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.[52]

"Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy."[53]

The "moving force" inquiry requires a plaintiff to make two showings: causation and culpability.[54]  A plaintiff must show a "direct causal connection . . . between the policy and the alleged constitutional deprivation."[55]  The "moving force" inquiry imposes a causation standard higher than "but for" causation.[56]  Under the culpability requirement, if the policy is facially lawful, a plaintiff must also show that the municipality "promulgated [the policy] with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result."[57]   Even a showing of heightened

---

[51] *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell*, 436 U.S. at 694).

[52] *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam).

[53] *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984) (en banc).

[54] *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

[55] *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992).

[56] *Id.*

[57] *Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (quoting *Brown*, 520 U.S. at 407).

No. 14-30021

negligence is insufficient to show the deliberate indifference needed to prove municipal liability.[58]

The Masons point to numerous acts that they claim evince a policy or custom. First, the Masons argue that the three officers approached Mr. Mason without sufficient information. They allege that the three officers "agree that they do not listen to the computer routinely" and provide expert testimony establishing that officers need the information they receive from dispatch. However, the record does not support the Masons' assertion. In his statement to Garcia, the State Police investigator, Faul said that he did not read the notes on the screen in his vehicle about the armed robbery reported at Babino's apartment; rather, he *listened* to the dispatcher read the comments to him, describing the suspect and the location. Faul's statement also says that after he told the dispatcher that he was going to the armed robbery at Babino's apartment rather than the one at Marshall's, Faul stated that "the computer and [sic] did all this stuff, but I never paid no attention to the computer." On summary judgment, we must make "justifiable" inferences in the nonmovant's favor.[59] Because Faul plainly stated that he received the information from dispatch verbally rather than reading the written notes on a call, no reasonable jury could infer that Faul's later statement that he "never paid no attention to the computer"—read in context—meant that he was not aware of the information describing the suspect that was communicated verbally. Alternatively, assuming the officers ignored dispatch and that ignorance reached the level of custom, the Masons have not met their burden on causation. They have not pointed to any information that dispatch provided

---

[58] *Id.* (quoting *Brown*, 520 U.S. at 407).

[59] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

No. 14-30021

on the computer that, if known by Faul, would have altered the course of events.

Second, the Masons focus on Faul's use of the police dog. They note that Faul admitted to not knowing of Lafayette's policies on the use of canines and that he admitted that it is unusual to use a dog when firing a weapon. They also contend that his conduct showed an inability to retain his training about using a police dog. This evidence does not identify a municipal policy or custom. To the contrary, it shows, at most, that Faul *failed* to follow policy.

Third, the Masons note that the three officers failed to maintain cover when approaching Mr. Mason; their experts allege that this is "evidence of a systemic practice." However, the Masons have not produced any evidence that the officers' failure to maintain cover was more than an "isolated violation."[60] Therefore, they have not met their burden of showing a custom or policy.

Similarly, the Masons seek to impose *Monell* liability by alleging several other errors by the officers. They point to the officers' failure to negotiate and conflicting commands to Mr. Mason and Babino as well as Faul's decision to shoot Mr. Mason when he was already on the ground. But, again, the Masons provide no proof that these practices rise to the level of custom or policy.

Finally, the Masons point to defects in Lafayette's investigatory and disciplinary proceedings. They allege that Lafayette police cleaned the crime scene and manipulated Mr. Mason's gun. They also fault Lafayette for keeping Faul on the job because he discussed the incident with the state-police investigator after his official interview terminated. We have held that "it is nearly impossible to impute lax disciplinary policy to [a municipality] without showing a pattern of abuses that transcends the error made in a single case."[61]

---

[60] *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984).

[61] *Piotrowski*, 237 F.3d at 582.

No. 14-30021

Here, the Masons have not provided evidence of problems with Lafayette's disciplinary and investigatory procedures outside the present case. Accordingly, Lafayette and Chief Craft cannot be held liable under *Monell*.

## VIII

The Masons also bring claims under Louisiana state law. The parties agree that the Fourth Amendment's reasonableness standard applies to the state-law claims, such that the state-law claims rise or fall with the Fourth Amendment claim. For this proposition, the parties and the district court have cited to our unpublished opinion in *Winston v. City of Shreveport*[62] but have not pointed to any published cases that directly establish this proposition[63] from our court or the Louisiana Supreme Court.[64]

Because the parties are in agreement but have not thoroughly briefed the issue, we assume, without deciding, that Louisiana law employs the same reasonableness standard as the Fourth Amendment. Therefore, we reverse the district court's grant of summary judgment on the Masons' claims against Faul under Louisiana state law and remand.

---

[62] 390 F. App'x 379, 385-86 (5th Cir 2010) (per curiam) (citing *Reneau v. City of New Orleans*, No. Civ.A. 03–1410, 2004 WL 1497711, at *4 (E.D. La. July 2, 2004)).

[63] *See Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000) ("If the Louisiana Supreme Court has not ruled on this issue, then this Court must make an 'Erie guess' and 'determine as best it can' what the Louisiana Supreme Court would decide." (quoting *Krieser v. Hobbs*, 166 F.3d 736, 738 (5th Cir. 1999)); *see also* 19 WRIGHT, MILLER, & COOPER, FEDERAL PRACTICE AND PROCEDURE § 4520 (explaining that the *Erie* doctrine applies even when the basis of jurisdiction is not diversity).

[64] *Compare Kyle v. City of New Orleans*, 353 So.2d 969, 973 (La. 1977) ("Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case. A court must evaluate the officers' actions against those of ordinary, prudent, and reasonable men placed in the same position as the officers and with the same knowledge as the officers."), *with Mathieu v. Imperial Toy Corp.*, 646 So.2d 318, 323 (La. 1994) ("The *reasonableness* test we employed in *Kyle* is based upon the text of the Fourth Amendment to the United States Constitution, *as well as La.Code Cr.P. art. 220*." (second emphasis added) (footnote omitted)).

No. 14-30021

\*          \*          \*

For the foregoing reasons, we AFFIRM the district court's judgment with regard to the Masons' substantive due process and deliberate indifference claims; we REVERSE the district court's judgment that Officer Faul is entitled to qualified immunity with respect to the Fourth Amendment and state law claims, as to the final two shots; and REMAND for consideration in the first instance whether Officer Faul's other actions are entitled to qualified immunity in the light of Babino's testimony.

No. 14-30021

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring in part and dissenting in part:

As Quamaine Mason and his girlfriend, Racquel Babino, stepped outside of her apartment, they were met by three officers with guns drawn. Quamaine put his hands up and stood still. Officer Martin Faul and his police dog together attacked Quamaine, Faul shooting him seven times at point-blank range as he fell down struggling to fend off the dog. No other officer fired a shot. I concur in the rejection of immunity for the final two shots and the disposition of Appellants' other claims, but I dissent from the majority's refusal to address the district court's grant of qualified immunity for the first five shots that led to Quamaine's senseless death.

I.

Accepting the version of facts most favorable to Appellants, as we must,[1] I offer a narrative of events from which a reasonable jury could find that no reasonable police officer could have perceived an imminent threat to his own life or the life of another.

On December 9, 2011, Officer Martin Faul—a canine officer—was working the night shift. Responding to a reported armed robbery at a department store, Officer Faul heard a report of another armed robbery at Racquel Babino's apartment complex. Officer Faul immediately "volunteered for the call." Arriving on the scene at the same time as two other officers, all three officers ran toward the apartment with guns drawn. When the other officers gained the lead, he quickly took charge, yelling, "Y'all behind the dog."

The officers arrived at the apartment complex to see Quamaine Mason walking out the front door of an apartment with a young woman. Quamaine matched the description of the suspect, and the police call had stated that he

---

[1] *See Ferraro v. Liberty Mut. Fire Ins. Co.*, 796 F.3d 529, 531 (5th Cir. 2015).

was armed.[2]  When the officers saw him, he was not fleeing or threatening anyone; he was walking quietly out the front door with a female companion. The young woman with him, upon seeing the police officers with already-drawn weapons, immediately shouted out that Quamaine had done nothing wrong. Quamaine, who wanted to be a police officer and was actively applying to agencies in the area, had a gun on his waistband.  He had a permit to carry this gun.[3]

Quamaine stood still with his hands up and empty, complying with all police instructions.[4]  But holding his dog by its collar, Officer Faul and the dog charged Quamaine—the two were separated by less than the length of the dog's thirty-six-inch tether.  Officer Faul shouted "Gun!," and launched the dog onto Quamaine.  When the dog hit Quamaine, he began falling to the ground reflexively trying to fend off the attack with his hands.  As Quamaine fell, Officer Faul began shooting him.  Indeed, Officer Faul began firing nearly simultaneously with his deployment of the dog, which continued attacking throughout the shooting.  This means that Officer Faul was firing at point-blank range and that the assault was of man and dog, not dog then man. Neither of the other two officers on the scene fired a single shot.

The autopsy confirms that the paths of the shots which hit Quamaine are explained only by his struggle with the dog as he falls to his left and to the

---

[2] The characterization of the preceding incident as armed robbery was an error made by the dispatcher.

[3] Appellees represent that they performed a records search and were unable to find any evidence that Quamaine held a concealed weapons permit, Appellees' Brief at 7, but at least two different people recall seeing documentation of this permit.  Appellees also are not confident enough in their search efforts to represent that Quamaine definitely did not have such a permit.  *See id.* ("[E]ven assuming *arguendo* that [Quamaine] held a valid permit . . . ."). To the extent this fact is disputed, we must resolve the dispute in favor of Appellants. *See Ferraro*, 796 F.3d at 531.

[4] Babino also stated that Quamaine never did anything threatening, presumably including taking up a fighting stance.

ground. None of the seven shots hit Quamaine head-on, instead striking him in downward paths from the side and back. The closest to head-on is the shot which hit Quamaine's chin at a sharp downward angle, then traveled through his neck (never exiting his body) to his chest. Dr. Traylor, who gave a "plausible order of shots fired based on the [witness] statements," believed this shot was the first to hit. However, this account is contradicted by other evidence;[5] indeed, Babino stated that she believed the first shot hit Quamaine's chest or shoulder rather than his chin. Whenever the chin shot struck, its downward trajectory can be explained only by Quamaine's struggle with the dog.

While the dog was on Quamaine, Officer Faul shot Quamaine seven times at point-blank range (recall that the dog was on a thirty-six-inch tether held by Officer Faul's left hand and his gun was being fired with his right). If Quamaine did move on the ground prior to Officer Faul firing the last two shots, it may have been due to the dog, which was still "tearing at" Quamaine's hip, "grabbing him and pulling him back." However, there is evidence that Quamaine did *not* move during the pause between the first five and the last two shots to hit him. Babino's deposition indicates that her attention was fixed on Quamaine throughout the shooting, and officer accounts provide further support—she was watching Quamaine. When asked if she saw Quamaine move once he was on the ground, she stated that he picked up his head, but she did not see him "move his body, the trunk of his body." She also stated that she did not see Quamaine make "any threatening action . . . towards anyone" once the apartment door opened or make "any effort whatsoever . . .

---

[5] Dr. Traylor's version of the bullet's trajectory as "slightly right to left" differs from the autopsy, which reported the trajectory as "left to right."

No. 14-30021

to fight back against the police."[6]

Officer Galland reported that Quamaine made a rolling motion similar to that reported by Officer Faul, but only *after* all the shots were fired, and stated that Quamaine's hands were above his head at the time—suggesting that Officer Faul's timeline might be mistaken. Finally, if the last two shots hit Quamaine's back, as suggested by testimony from Officer Faul and another witness, then both his humeri were already fractured by the point at which Officer Faul reports that he tried to spin himself over. Though he may still have been able to move his arms, "it would have been extremely painful" and they were "not going to help him at all" to turn over. As the majority correctly concludes, a reasonable trier of fact could find that Quamaine never moved threateningly once on the ground.[7]

## II.

### A.

"[W]hen reviewing a grant of summary judgment in the Fourth Amendment context, after first construing disputed historical facts in favor of the non-movant, the court must then ask how a reasonable officer would have perceived those historical facts."[8] On the narrative sketched above, Officer Faul and the dog together attacked Quamaine even though the young man made no threatening movement whatsoever. Even if Officer Faul *actually believed* Quamaine was going to fight him—despite his complete compliance and facing three drawn guns—no reasonable police officer could perceive such

---

[6] Babino here refers to all times *after* the first shot; she also stated Quamaine made no threatening movement *prior* to any shots.

[7] *See Goodman v. Harris County*, 571 F.3d 388, 398 (5th Cir. 2009) ("Ashabranner's testimony that Michael pushed him and attempted to drown Nero was contradicted by medical evidence and witness testimony that Michael's right arm was 'virtually useless' due to a gun-shot wound suffered only three months prior which had not yet healed."); *Sanchez v. Fraley*, 376 F. App'x 449, 452 (5th Cir. 2010).

[8] *Hill v. Carroll County*, 587 F.3d 230, 234 (5th Cir. 2009).

No. 14-30021

behavior as life threatening. There is no doubt that Officer Faul's use of lethal force in these circumstances violated the Fourth Amendment. "Where the suspect poses no immediate threat to the officer and no threat to others," the use of deadly force is not justified.[9] We also "need not dwell" on the issue of qualified immunity. "It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a . . . felon who does not pose a sufficient threat of harm to the officer or others."[10]

The majority fully agrees with this analysis with respect to the final two shots, but it leaves the district court's grant of summary judgment in place with respect to the first five shots—refusing to address the appeal from that judgment. That is, it leaves Officer Faul entitled to qualified immunity for these shots, electing to "remand for consideration in the first instance whether Officer Faul's other actions are entitled to qualified immunity in the light of Babino's testimony"—without vacating the grant of summary judgment. With all due respect, this result is as inexplicable as it is unexplained. The district court concluded that Officer Faul was entitled to qualified immunity for all seven shots—it has already addressed "in the first instance" whether Officer Faul is entitled to qualified immunity for the first five shots "in the light of Babino's testimony." Moreover, this partial remand cannot be squared with the fact that the majority *does* address the final two shots, where Babino's testimony was critical. I am at sea as to why the majority slices a single event into distinct segments—seven shots into five and two—then performs the proper analysis with respect to one segment—the final two shots—and then

---

[9] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

[10] *Lytle v. Bexar County*, 560 F.3d 404, 417 (5th Cir. 2009); *see also Graves v. Zachary*, 277 F. App'x 344, 349 (5th Cir. 2008) ("It does not take a specific case for an officer to know that he cannot shoot a compliant suspect and that he cannot fire again at someone who is objectively 'downed or incapacitated.'").

No. 14-30021

orders the district court to try again with respect to the other segment—the first five shots. This decision is especially puzzling when the issue is qualified immunity. As we have said before in this context, there is no reason to require the district court to address again a legal question that this Court reviews de novo.[11] And we inevitably will face another appeal before this case can go to trial, at which evidence offered to the jury can hardly be segmented.

The upshot is that the majority simply declines to "express an opinion" with regard to a legal issue—the main issue of this case—that was squarely addressed by the district court, fully briefed by the parties, and remains the heart of this case. The majority also declines to vacate the district court's judgment with respect to the first five shots. To these eyes, that is indefensible.[12] Nowhere in its opinion does the majority explain from where it derives the authority to slice a single event and choose from the resulting parts of the appeal which to decide. We are duty-bound to decide the issues essential to the appeal. "Federal appellate courts' twin duties are to decide appeals and to articulate the law."[13] The majority's opinion does neither with respect to the first five shots and complicates the future path of this case. One thing is sure—long delay in a trial that the majority has already conceded must occur.

---

[11] *See Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 n.25 (5th Cir. 1996); *see also Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 263 (5th Cir. 2005) ("While the normal procedure where the lower court has not considered a pertinent issue is to remand the case, considerations of judicial economy can dictate otherwise in circumstances such as these, where the issue is a purely legal question subject to plenary review by this court.").

[12] When remanding because the district court committed a legal error, our uniform practice is to vacate the judgment. *See, e.g., Veasey v. Abbot*, 796 F.3d 487, 503-04 (5th Cir. 2015); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 232 (5th Cir. 2009) (per curiam); *Gros v. City of Grand Prairie*, 181 F.3d 613, 617 (5th Cir. 1999). This is sensible. If the district court's judgment is predicated on an erroneous legal determination, we should not leave it in place. If it is not, there is no basis to return a part of the case to the district court.

[13] *United States v. McFarland*, 311 F.3d 376, 417 (5th Cir. 2002) (Jones, J., dissenting from the denial of rehearing en banc).

No. 14-30021

B.

Whatever the majority's reasoning, and with all due respect, I cannot concur in its opinion leaving the door open for another decision in Officer Faul's favor. This "remand for consideration" implicitly holds that on this record the district court could conclude that Officer Faul enjoys qualified immunity as a matter of law for the first five shots and to these eyes that cannot be so. Appellees rely upon the principle that officers may use deadly force when threatened even if they negligently create circumstances leading to the need for force.[14] That is, Appellees argue that Officer Faul was justified in using deadly force because even if he negligently released his attack dog, Quamaine reacted—in a reflexive attempt to fend off the dog—by moving his hands downward and unintentionally closer to the gun in his waistband. But that principle does not address the situation here, where an officer used both a dog and a gun together as part of the same attack, the same direct and intentional deployment of deadly force.

The doctrine regarding negligent creation of the circumstances requiring deadly force is necessary to avoid collapse of the jurisprudence of deadly force into a negligence action, but it is not without limit—for it would then blur and ultimately erase the effort of the law to limit the use of deadly force. And I do not read the extant cases to say otherwise. In *Young*, the officer negligently increased the background level of risk by failing to maintain cover, failing to radio for help or wait for backup, placing his patrol car in a dangerous position, and directing the suspects to exit their car.[15] We have followed *Young* in cases where officers failed to maintain cover,[16] failed to identify themselves as

---

[14] *See Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985).

[15] *Id.* at 1351.

[16] *Carnaby v. City of Houston*, 636 F.3d 183, 188 (5th Cir. 2011).

No. 14-30021

officers,[17] or otherwise increased the riskiness of the situation.[18] Also following *Young*, we have said that "[t]he excessive force inquiry is confined to whether the [officer] was in danger *at the moment of the threat* that resulted in" the force, but we immediately continued that earlier events "set the stage for what followed" and held that factual disputes regarding them were material.[19]

Excessive force cases are highly fact specific, and two key circumstances distinguish this case from *Young* and its progeny. First, the officer's use of the dog to attack Quamaine did not merely set a risky scene before shots were fired. It was at all times an assault of dog and gun. The moment the dog did as trained, Officer Faul began firing away. That he continued to put two more rounds in his back after Quamaine was lying on his stomach is doubly relevant. It signifies both as an independent act, as the majority observes, but also for its powerful suggestion that Officer Faul intended his force to be deadly from the beginning.[20] Officer Faul's multiple breaches of police protocol—including "rush[ing] into . . . the killing zone" without a plan, failing to take cover, and insisting on taking the lead despite being tethered to an attack dog—suggest the same. Though Officer Faul cannot be held liable for these negligent actions, a jury could certainly infer that they paint the picture of an officer eager to engage in a deadly confrontation.

---

[17] *Fraire v. City of Arlington*, 957 F.2d 1268, 1275-76 (5th Cir. 1992).

[18] *See Rockwell v. Brown*, 664 F.3d 985, 992-93 (5th Cir. 2011) (officers broke into room where upset, mentally ill man had barricaded himself); *Ramirez v. Knoulton*, 542 F.3d 124, 127, 129-30 (5th Cir. 2008) (officer "fail[ed] to consider the use of non-lethal force or to employ a crisis negotiator" in response to a non-complying suspect); *Owens v. City of Austin*, 259 F. App'x 621, 624 n.2 (5th Cir. 2007) (officer failed to follow proper procedures).

[19] *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 493 (5th Cir. 2001) (citing *Fraire*, 957 F.2d at 1276; and *Young*, 775 F.2d at 1353). *But see Rockwell*, 664 F.3d at 992-93 (refusing to consider circumstances leading to use of force).

[20] *See Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996) ("The nature of the wounds indicate that Baker, Jr., was not facing Putnal when he was shot. The number of shots and the nature of the wounds raise a serious question as to the reasonableness of his conduct, more of a question of fact than a court may dispose of on summary judgment.").

No. 14-30021

Second, in the *Young* cases, officers' actions created risky situations, but the suspects then chose to commit intervening acts which threatened the officers.[21]  The officers set the scene, but the tragic outcome was not inevitable; suspects were free to comply with officer commands[22]—but instead chose to attack, flee, or reach for objects out of officers' view.  Officers faced with these newly developed threats then responded reasonably in the moment.  There was no intervening act in this case.  To the extent Quamaine moved his hands, he cannot be faulted for reflexively attempting to protect himself from the dog.  No reasonable officer would have perceived his reflexive movements as threatening.  Indeed, given the firing sequence and trajectories, a reasonable jury could easily conclude that hand movement had nothing to do with this shooting.

*Young* and *Ramirez* do not provide an answer here.  We have recognized that summary judgment is properly denied "where fact issues exist[] about whether a police officer's use of force was justified or was 'unreasonably created.'"[23]  Other circuits with rules similar to *Young* have recognized that officers may be liable for using excessive force when their actions cross the line

---

[21] *Young*, 775 F.2d at 1351 (suspect who tried to flee scene of drug deal reached down into car when ordered to exit); *Rockwell*, 664 F.3d at 989-90 (suspect attacked officers with knives); *Carnaby*, 636 F.3d at 186 (suspect led police on car chase, refused to get out until police smashed a window, bent down in car where officers could not see hands, and then swung hands, one grasping something, toward officers); *Fraire*, 957 F.2d at 1275 (suspect fled from police in car, then defied police orders and drove straight at officer); *Ramirez*, 542 F.3d at 127 (suspect exited car holding gun and brought his hands together in front of his waist, all the time failing to comply with officer commands); *Owens*, 259 F. App'x at 622-23 (suspect refused to allow himself to be handcuffed, then accelerated car with officer's arms trapped inside so that officer was dragged along).

[22] Rockwell's mental illness may have restricted his choices once cornered, but police did not. *See Rockwell*, 664 F.3d at 989.

[23] *Edmond v. City of New Orleans*, 20 F.3d 1170, at *2 (5th Cir. 1994) (precedential under 5th Cir. R. 47.5.3); *see also Bazan*, 246 F.3d at 493 (holding that earlier events "set the stage for what followed," and that factual disputes regarding those events were material).

No. 14-30021

from negligence to recklessness.[24] Still others have recognized the principle that officers may be liable for excessive force when their actions *directly create* the justification for the force. In *Ribbey v. Cox*, the Eighth Circuit held that a police officer cannot break a car window and then rely upon the suspect's "reflex[ive] [movement] to protect himself from the breaking glass" to justify the use of lethal force.[25] In *Estate of Starks v. Enyart*, the Seventh Circuit held that a police officer cannot jump in front of a suspect's car and then rely upon the danger of the oncoming car to justify the use of lethal force.[26] In *Sample v. Bailey*, the Sixth Circuit held that a police officer cannot order a suspect to get out of his hiding place and then rely upon the suspect's efforts to comply with that command to justify the use of lethal force.[27] And in *Kopf v. Wing*, the Fourth Circuit held that a police officer cannot deploy a dog and then rely upon the inability of the suspect to put his hands up as the dog attacks him to justify the use of force.[28]

These cases chart a limit to *Young* comporting with common sense. At some point, an officer crosses the line between setting up a risky situation and actually himself directly causing the "threat." Officers are at risk in nigh every

---

[24] *See, e.g.*, *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002) ("[W]here an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force."); *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) ("The reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." (footnote omitted)).

[25] 222 F.3d 1040, 1042-43 (8th Cir. 2000).

[26] 5 F.3d 230, 235 (7th Cir. 1993); *see also Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008) ("Where a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive.").

[27] 409 F.3d 689, 697 (6th Cir. 2005).

[28] 942 F.2d 265, 268 (4th Cir. 1991). As I do, the court concluded that "a jury could find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog bites his scrotum." *Id.*

No. 14-30021

traffic stop as they approach a vehicle, as are the persons in that vehicle—so also with street confrontations. Yet no one will maintain that an officer can lawfully avoid all risk by simply shooting and asking questions later. So long as the suspect has his hands in the air—and certainly when three officers have drawn guns trained on him—an officer cannot simply shoot him, avoiding all risk to himself. If that is so, an officer cannot knock him down and shoot him because he then no longer has his hands up. That the officer has information that the suspect is armed does not work a different result.[29] To say otherwise is to hold that a deadly attack upon a man standing with his hands in the air is not excessive force just because he has a gun in his waistband—an unconscionable result insupportable in law, and perversely confounding the current sanctioning of open carry of handguns.

III.

Under Appellants' version of the facts, there was nothing that Quamaine Mason or indeed anyone in the area matching his description could do to escape Quamaine's fate. He was dead as soon as police were called. He complied with all orders until he was attacked by a dog and police officer who shot him seven times at point-blank range. We have the responsibility of providing arresting officers all guidance in the use of deadly force that we can, as these cases are often close and difficult—and when these cases are close and difficult, we clothe the officers with post-hoc immunity. This attack of man and dog is far from that genre. We ought not decide this case—that decision belongs to a jury. Avoiding a trial is an important component of qualified immunity, but denial of qualified immunity does not deny Officer Faul his immunity defense from

---

[29] *See Cole v. Carson*, Nos. 14-10228, 15-10045, 2015 WL 5672071, at *4 (5th Cir. Sept. 25, 2015) ("[T]here is no open season on suspects with guns.").

No. 14-30021

liability.  It only concludes that he must be judged by a jury of his peers.[30] Appellants should not have go through the time and expense of another interlocutory appeal to get this Court to recognize as much.  I cannot join this newly minted form of abstention, and I respectfully dissent.

---

[30] *See, e.g.*, *Swindle v. Livingston Par. Sch. Bd.*, 655 F.3d 386, 402 (5th Cir. 2011); *Harper v. Harris County*, 21 F.3d 597, 601 (5th Cir. 1994) (per curiam) ("Of course, [the officer] still may assert qualified immunity at trial.").